IN THE DISTRICT COURT OF THE VIRGIN ISLANDS

DIVISION OF ST. THOMAS AND ST. JOHN

APPELLATE DIVISION

| | |
|---|---|
| GENT MOSBY, | ) D.C. Crim. App. No. 1997-0015-1 |
| | ) |
| | ) |
| Appellant, | ) Super. Ct. Crim. No. F1/1996 |
| vs. | ) |
| | ) |
| GOV'T OF THE VIRGIN ISLANDS, | ) |
| | ) |
| Appellee. | ) |
| _____ | ) |

On Appeal from the Superior Court of the Virgin Islands
The Honorable Ishmael A. Meyers, Judge Presiding

Considered: January 22, 2010
Filed: September 16, 2011

BEFORE: **RAYMOND L. FINCH**, Senior Sitting Judge of the District Court of the Virgin Islands; **LEGROME D. DAVIS**, Judge of the District Court of the Eastern District of Pennsylvania, sitting by designation; and **PATRICIA D. STEELE**, Judge of the Superior Court, Division of St. Croix, sitting by designation.

Attorneys:

Rebecca Weiss, Esq.
Treston E. Moore, Esq.
St. Thomas, U.S.V.I.
          For the Appellant,

Maureen Phelan, Esq. AAG
Pamela R. Tepper, AAG
St. Thomas, U.S.V.I.
          For the Appellee.


Per Curiam.

---

**MEMORANDUM OPINION**

---

Appellant Gent Mosby ("Mosby") was convicted on August 19, 1996, of conspiracy to commit murder, first-degree murder, unauthorized possession of a firearm, and threatening a witness, all in connection with the murder of Stephen Hodge.[1] He was sentenced to life imprisonment. Mosby's timely appeal followed. For the following reasons, we affirm Mosby's conviction on all counts and the sentence imposed.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

"After a jury has returned a guilty verdict we are bound to interpret the evidence in the light most favorable to the [G]overnment." *United States v. Wood*, 486 F.3d 781,783 (3d Cir. 2007). With this standard in mind, we offer the following factual background. On March 26, 1994, between 11:00 p.m. and shortly after midnight, Officer Stephen Hodge of the Virgin Islands Police Department ("VIPD") was shot and killed in the front yard of his home in Lindbergh Bay, St. Thomas. (Trial. Tr. vol. 2, 206:12-22, 217:22-23, Aug. 7, 1996.) Hodge was shot fourteen times by four different guns, including one

---

[1] Gent Mosby is also known as "John Williams," "Money," and "G-Money." (Trial Tr. vol. 4, 30:1-31:8, 62:3-23, Aug. 9, 1996.)

shotgun, one 9 mm pistol, one .380 auto-caliber pistol, and one rifle. (Trial Tr. vol. 3, 61:17, Aug. 8, 1996.)

Earlier that day, at approximately 5:00 p.m., Gwentin Sellwood ("Sellwood") visited Mosby's clothing store, New York's Latest Fashions, where he saw Mosby with William Vanterpool ("Vanterpool") and Carlos Fleming ("Fleming"). (Trial Tr. vol. 4, 65:1-66:4, Aug. 9, 1996.) Sellwood knew Mosby for approximately two years prior to this meeting. (*Id.* at 64:18-22.) Sellwood heard Mosby tell Vanterpool and Fleming that "[he] was going to pick them up later about 11:30. They have a serious job to do . . . ." (*Id.* at 67:8-11.) Sellwood then saw Mosby remove three guns from a bag and give Vanterpool and Fleming each a gun. (*Id.* at 68:13-19.) Sellwood noticed a long gun near Mosby with its handle sawed-off, and a towel on the back of Mosby's chair. (*Id.* at 84:1-14, 86:6-13.) Vincent Daniel ("Daniel") also visited New York's Latest Fashions around that same time. Daniel and Mosby were familiar with one another. (*Id.* at 31:14-16.) Daniel observed Mosby and Fleming in the store and saw Pedro Harris ("Harris") and Vanterpool in the bathroom. (*Id.* at 37:9-21, 39:2.) Daniel heard a clicking sound emanating from the bathroom, which he believed to be the sound of a gun. (*Id.* at 39:6-12.)

Later in the evening, Bernice Celestine ("Celestine") was looking out of a window in her home and saw a pick-up truck outside Hodge's home with two people in the cab and one person in the flat bed. (Trial Tr. vol. 1, 172:15-24, 174:22-23, Aug. 6, 1996.) The man in the back of the truck got out and put an object in the grass near Hodge's home. (*Id.* at 175:22-76:13, 181:14-16.) At approximately 11:30 p.m. or 11:45 p.m., Eustace Sorhaindo ("Sorhaindo") was locking the gate of the Seventh Day Adventist Church near Hodge's home when he observed four men dressed in all black walk past him in the direction of Hodge's home. (Trial Tr. vol. 2, 24:6-19, 25:10-26:18, 27:4.) Sorhaindo returned home, and shortly thereafter, heard "at least ten to fifteen gun shots" coming from the vicinity of Hodge's home. (*Id.* at 32:14-21.) Celestine also heard gun shots coming from the Hodge residence. (Trial Tr. vol. 1, 183:17-19.)

Shorn Pennyfeather ("Pennyfeather") was exiting his home in Lindbergh Bay around midnight when he heard gunshots. (*Id.* at 199:6-8.) Seconds later, he saw four men running down the street. (*Id.* at 199:8-10, 200:4-19.) The men were dressed in all black with hoods covering their heads, and two of them were carrying long guns. (*Id.* at 208:6-12, 208:24.) Adolph Potter ("Potter"), another neighbor in Lindbergh Bay, also heard

gunshots that evening.  He then noticed a "head" pass by his house and heard a car start its engine.  (Trial Tr. vol. 2, 206:20, 208:8-10.)  A few hours later, between 1:00 a.m. and 2:00 a.m., Daniel saw Mosby and Fleming dressed in all black driving a "gr[e]y/silver" pickup truck.  (Trial Tr. vol. 4, 42:23-25, 44:12-20, 47:6.)

Two days after the murder, Sellwood saw Mosby exiting a police car.  Mosby told Sellwood that he was picked up for being "involved in killing the policeman" and that he was "not going to stay around here and take no fucking jail in this little small fucking country . . . ."  (Trial Tr. vol. 4, 75:24-76:12.)  Mosby then abruptly packed up his store and left the island.  (*Id.* at 77:1-78:8; Trial Tr. vol. 7, 55:9-12, Aug. 14, 1996.)  Sellwood next saw Mosby in May or June of 1994. Sellwood was walking down the street when he was stopped by Mosby, Fleming, and Vanterpool in a grey truck.  (*Id.* at 80:21-24, 82:2-8.)  Mosby threatened Sellwood,

> . . . when I send my boys them to you, . . . you make sure you have something to give them. . . . and whatsoever you hear in the store or whatsoever you see in the store, don't ever leave me hear it or otherwise me and the boys them will take you out.

(*Id.* at 82:15-22.) Fleming and Vanterpool added, "Yes, you hear it."  (*Id.* at 83:4-13.)

An investigation began immediately following the murder.
VIPD officers and a forensic team arrived at the scene, removed
Hodge's body and gathered evidence, including shell casings and
a towel. (Trial Tr. vol. 2, 142:6-24, 145:2-46:13, 239:12-21.)
The towel tested positive for both gun powder and gunshot
residue. (Trial Tr. vol. 3, 251:10-15.) Sorhaindo was
interviewed by the police twice on March 27, 1994 and once on
April 21, 1994, and he gave inconsistent descriptions of the
four men he saw on the night of the murder. (Trial Tr. vol. 2,
54:6-7, 61:3-9.) On June 21, 1995, the FBI presented Sorhaindo
with a photo array. Sorhaindo identified Mosby, who was
depicted in photo number 5, as one of the men he had seen on
the night of the murder. (Pretrial Hr'g Tr. 30:7, 51:11, Apr.
19, 1996.) The police also obtained information from Athnell
Coker ("Coker"). Four or five days after the murder, Coker
spoke with Maurice Richardson ("Richardson"). (Trial Tr. vol.
5, 44:3, Aug. 12, 1996.) Richardson said that he was involved
in the murder of Hodge and asked Coker to hold a sawed-off
shotgun for him, which had been used to shoot Hodge. (*Id.* at
44:3-45:24, 49:6-7.) Coker testified that he buried the gun
behind his house, and it was later removed by men sent on
Richardson's behalf. (*Id.* at 46:1-5.) The shotgun has never
been recovered. (*Id.* at 54:24.)

On September 29, 1995, an arrest warrant was issued for
Mosby who was incarcerated in New Jersey on unrelated charges.
On January 2, 1996, the Government filed a seven-count
superseding information against Mosby and his co-defendants,
Vanterpool, Fleming, Harris, and Richardson.[2]  Mosby was charged
with: conspiracy to commit murder, in violation of V.I. Code
Ann. tit. 14, §§ 551(1) and 522; first degree murder, in
violation of V.I. Code Ann. tit. 14, §§ 922(a)(1) and 11; four
counts of unauthorized possession of four separate firearms, in
violation of V.I. Code Ann. tit. 14, §§ 2253(a) and 11; and
threatening a witness, in violation of V.I. Code Ann. tit. 14,
§§ 1510(a)(1) and 11.

On August 6, 1996, a joint five-defendant jury trial
commenced in the Superior Court of the Virgin Islands.[3]  The
jury returned a guilty verdict on all counts against Mosby on
August 19, 1996.  Mosby filed a motion for judgment of
acquittal pursuant to Federal Rule of Criminal Procedure 29, or
in the alternative for a new trial pursuant to Federal Rule of

---

[2]  The Government filed an amended superseding information against Mosby and
his four co-defendants on August 8, 1996.

[3]  At the time of trial, the trial court was known as the Territorial Court
of the Virgin Islands, and its judges were referred to as Territorial Court
Judges.  Effective January 1, 2005, however, the name of the Territorial
Court changed to the Superior Court of the Virgin Islands. *See* Act of Oct.
29, 2004, No. 6687, sec. 6, § 2, 2004 V.I. Legis. 6687 (2004).  Recognizing
this renaming, we employ the term Superior Court.

Criminal Procedure 33 and Superior Court Rule 135, which the
Superior Court denied on November 12, 1996. Mosby filed a
timely notice of appeal on November 12, 1996.[4]

Mosby challenges his convictions on the following grounds:
(1) violation of his Sixth Amendment right to compulsory
process; (2) error in denying his motion for a new trial
because of trial error and because the verdict was against the
weight of the evidence; (3) failure to read back Sorhaindo's
cross-examination testimony to the jury; (4) error in denying
his motion to suppress Sorhaindo's out-of-court identification
and in-court identification; (5) error in denying his pretrial
motion to sever and an alleged consequential *Bruton* violation;
(6) prejudicial prosecutorial misconduct; and (7) error in
denying his motion for change of venue.

## II. JURISDICTION

This Court has jurisdiction over appeals of final
judgments or orders that were entered before January 29, 2007.
*See* Revised Organic Act of 1954 23A, 48 U.S.C. § 1613(a); Act
of Oct. 29, 2004, No. 6687, sec. 6, § 2, 2004 V.I. Legis. 6687

---

[4]  Mosby filed his appellate brief on March 18, 2009.

(2004); *see also Joseph v. People of V.I.*, No. 2005-13, 2008 WL

5663569, at *5 (D.V.I. App. Div. 2008).[5]

## III. ANALYSIS

### A. The Sixth Amendment Right to Compulsory Process

Mosby argues that the trial court violated his Sixth

Amendment right to compulsory process when it (1) ruled that

Vargas Paniagua was an unavailable witness and (2) excluded the

tape-recorded conversations allegedly between Paniagua and SKS

as inadmissible hearsay.[6]  The Government responds that Mosby's

right to compulsory dues process was not violated because the

Government was not responsible for Paniagua's failure to appear

at trial; Paniagua was not a favorable witness; and the tape-

recorded statements were inadmissible hearsay.  Our review as

to whether the trial court violated Mosby's Sixth Amendment

right is plenary.  *United States v. Sanford*, 173 F. App'x 943,

946 (3d Cir. 2006) (citing *United States v. Tyler*, 164 F.3d

150, 156 (3d Cir. 1998)).  After reviewing Mosby's

---

[5]  The Court's jurisdiction to review criminal judgments and orders of the Superior Court is limited to cases in which the defendant has been convicted, and has not entered a guilty plea.  *See* V.I. Code Ann. tit. 4, § 33 (2006); 48 U.S.C. § 1613(a) (2006).

[6]  In his Brief, Mosby assigns both constitutional and evidentiary error to the trial court's rulings on Paniagua's availability and the admissibility of the tape recordings.  Because the compulsory process rubric established by the Supreme Court and the Third Circuit incorporates the evidentiary challenges asserted here, *see Gov't of V.I. v. Mills*, 956 F.2d 443 (3d Cir. 1992), we review both of Mosby's claims under this framework.

constitutional challenges, we find that both of his claims
fail.

The Sixth Amendment guarantees the accused in a criminal
prosecution the right "to have compulsory process for obtaining
witnesses in his favor." U.S. Const. amend. VI. The Supreme
Court "has extended the Compulsory Process clause to cover a
criminal defendant's right to present witnesses or evidence in
his defense, 'even though [such a right] is not expressly
described in so many words.'" *Gov't of V.I. v. Mills*, 956 F.2d
443, 445 (3d Cir. 1992) (quoting *Taylor v. Illinois*, 484 U.S.
400, 409 (1988)). However, this right is not absolute. For a
criminal defendant to establish that he was convicted in
violation of his right to compulsory process, he must satisfy
the three-part *Mills* test: "[f]irst, that he was deprived of
the opportunity to present evidence in his favor; second, that
the excluded testimony would have been material and favorable
to his defense; and third, that the deprivation was arbitrary
or disproportionate to any legitimate evidentiary or procedural
purpose." *Id.* at 446 (citing *Rock v. Arkansas*, 483 U.S. 44, 56
(1987)). We now consider each of Mosby's challenges.

### 1. Paniagua's In-Court Testimony

Mosby argues that the trial court violated his Sixth
Amendment right to compulsory process by failing to compel

Paniagua to testify at trial. During the course of an

unrelated DEA investigation, Paniagua allegedly admitted to his

involvement in the murder of Officer Hodge. Immediately before

trial, Mosby filed, and the trial court executed, a writ of

habeas corpus ad testificandum to secure the attendance of

Vargas Paniagua to testify at trial. (Writ of Habeas Corpus Ad

Testificandum, July 30, 1996, Appellant's App. II, 33-34.) At

the time, Paniagua was incarcerated for an unrelated conviction

in a facility outside of the Virgin Islands. After

complications arose with transporting Paniagua to court, the

trial court ruled that Paniagua was an unavailable witness.[7]

(Trial Tr. vol. 2, 7:2-23; Trial Tr. vol. 3, 9:17-15:17; Trial.

Tr. vol. 8, 233:21-24, Aug. 15, 1996.) Mosby asserts that he

satisfied his obligation to procure Paniagua as a witness by

filing the writ and the trial court or the Government should

have incurred the additional costs of securing Paniagua's

attendance. Mosby also claims that Paniagua's in-court

---

[7] During trial, the court learned of procedural errors with implementing the writ, but these problems were not fatal. (Trial Tr. vol. 2, 7:3-10.) The court was informed that because the U.S. Marshal Service had not received 30-days notice, it would cost $7,000.00 to transport Paniagua to St. Thomas. (*Id.* at 7:11-23; Trial Tr. vol. 3, 9:21.) The trial court was unable to pay and attempted to determine whether the Defendants or the Government were able to pay, but it did not rule on the issue. (Trial Tr. vol. 3, 11:20-15:15.) The defendants asserted that they were indigent and that they believed that it was the Government's obligation to pay the cost of transport. (*Id.* at 11:20; Trial Tr. vol. 6, 280:1, Aug. 13, 1996.) As a result of these problems, the trial court ruled that Paniagua was an unavailable witness under Federal Rule of Evidence 804(a)(5). (Trial Tr. vol. 8, 233:21-24.)

testimony would have been favorable and material to his
defense, and that failing to compel him to testify deprived
Mosby of his Sixth Amendment right to compulsory process. The
Government responds that Mosby and his co-defendants were
responsible for Paniagua's failure to appear at trial because
the writ was prepared improperly, and also that, in any event,
Paniagua's testimony would not have been in Mosby's favor.
This Court need not consider the trial court's ruling on
Paniagua's availability because it is clear from the record
that Paniagua's testimony would not have been material or
favorable to the defense.

By its own terms, the Sixth Amendment narrows the
compulsory process right to apply only to "witnesses in [a
defendant's] favor." U.S. Const. amend. VI. The Supreme Court
has further limited the right to testimony that is "material .
. . to his defense." *Mills*, 956 F.2d at 446 (quoting *United
States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)).
Evidence is material "only if there is a reasonable likelihood
that the testimony could have affected the judgment of the
trier of fact." *Id.* (quoting *Valenzuela-Bernal*, 458 U.S. at
867). A "reasonable likelihood" is a "probability sufficient
to undermine confidence in the outcome." *Id.* (quoting *United
States v. Bagley*, 473 U.S. 667, 682 (1985)). Mosby intended to

present Paniagua's testimony to support his theory that Hodge

was killed by VIPD officers in an effort to prevent Hodge from

exposing a narcotics distribution ring organized by corrupt

police officers.  Prior to and during trial, Mosby's counsel

stated that Paniagua would testify to his involvement in the

murder of Officer Hodge, particularly, that he acted as an

intermediary between VIPD officers and a hit man.  (Aff. of

Counsel in Supp. of Pet. for Writ of Habeas Corpus ad

Testificandum, Appellant's App. II, 30-31; Trial Tr. vol. 6,

284:11-17, Aug. 13, 1996.)  In support of this proffer, Mosby

presented tape-recorded conversations allegedly between

Paniagua and SKS, excerpts of transcripts of these

conversations, and DEA reports detailing its investigation of

Paniagua.  (*See* Trial Tr. vol. 6, 277:22-84:18; Tape Trs.,

Appellant's App. II, 35-39; DEA Reports, Appellant's App. II,

42-55.)

The trial court conducted a telephone conference with

Paniagua to test the proffer, during which Paniagua was

represented by counsel and sworn in by the clerk of court.

(Trial Tr. vol. 8, 184:17-85:1.)  The trial court confronted

Paniagua with the substance of the tape recordings.  Paniagua

denied that it was his voice on the tapes and denied that he

made statements to a confidential informant or anyone else

about his involvement in the murder of Officer Hodge. (*Id.* at
185:23-87:9.) Paniagua's sworn statements reveal that even if
compelled into court, his testimony would not have been
material or favorable to Mosby's defense.

Mosby asserts that the trial court had already found
Paniagua's testimony to be material and relevant when it issued
the writ of habeas corpus ad testificandum, and committed error
by reversing its ruling. Mosby refers this Court to *United
States v. Cruz-Jiminez*, 977 F.2d 95 (3d Cir. 1992), in which
the Third Circuit explained that a decision to issue the writ
depends on whether the witness's testimony is material and
relevant. *Id.* at 100. However, Mosby fails to acknowledge
that although the trial court may have found the *proffered
testimony* material and relevant, this does not end the inquiry
with respect to the *testimony itself*. In *Valenzuela-Bernal*,
the Supreme Court explained that when deciding whether evidence
is material, "courts should afford some leeway for the fact
that the defendant necessarily proffers a description of the
material evidence rather than the evidence itself . . . ." 458
U.S. at 874. But if the evidence itself is available, the
court considers the evidence rather than what was proffered.
*See also Luce v. United States*, 469 U.S. 38, 41 (1984) (finding
that, in the context of motions in limine for impeachment

through prior convictions, a trial court's ruling is subject to
change if defendant's actual testimony differs from what was in
the proffer).  The trial court afforded Mosby leeway when it
reviewed the proffer and found it to be material and relevant;
however, once the court tested the proffer, it was evident that
Paniagua's testimony was in fact not material or favorable to
the defense.  Therefore, Mosby's claim of constitutional error
fails.

## 2. The Tape-Recorded Statements

Mosby also challenges the trial court's exclusion of the
tape-recorded conversations allegedly between Paniagua and SKS
as a violation of his Sixth Amendment right to compulsory
process.[8]  Like the proffered testimony, the tape recordings
allegedly reveal Paniagua's involvement in the murder of
Officer Hodge.[9]  Having found Paniagua unavailable, the trial
court considered whether the tape-recorded statements made to
SKS were admissible as statements against interest under

---

[8] For purposes of this inquiry only, we assume the propriety of the trial
court's decision that Paniagua was unavailable.

[9]  The tapes cannot be located and are not part of the record on appeal.
(*See* Aff. of co-defendant Harris' Appellate Counsel Regarding Missing
Evidence, Appellant's App. II, 88-91.)  According to the trial court,
Paniagua allegedly stated on the tapes that: "(1) he was approached by three
(3) police officers who wanted to hire a hitman from Puerto Rico to kill
Officer Hodge; (2) he acted as a middleman and set up a meeting at Sugar Bay
Beach Resort to discuss the plans; and (3) the parties allegedly went to the
area where Hodge resided in order to conduct surveillance of the area."
(Judge Meyers' Nov. 12, 1996 Mem. & Op. 20, Gov't's Supp. App.)

Federal Rule of Evidence 804(b)(3), or under the residual

hearsay exception, Rule 807.[10]  The trial court excluded the

statements as inadmissible hearsay, concluding that they were

not trustworthy or reliable.  (Trial Tr. vol. 8, 238:3-7,

238:24-39:1.)  Mosby now argues that the tape-recorded

statements were trustworthy, and the trial court's ruling

deprived him of evidence that was material and favorable to his

defense.  We disagree.  Although Mosby may be able to

demonstrate that these statements were material and favorable

to his defense, he cannot show that the trial court's

admissibility ruling was either arbitrary or disproportionate

to any legitimate evidentiary interest.[11]

Examining the second prong of the *Mills* compulsory process

test, this Court acknowledges that Paniagua's tape-recorded

statements would have been favorable and material to Mosby's

defense.  Unlike the proffered testimony, the admissibility of

the out-of-court statements was not dependent upon Paniagua's

adoption or denial of the statements.  Thus, the substance of

---

[10]  The transcripts and briefs refer to Rule 804(b)(5) as the residual
hearsay exception.  This rule was transferred to Rule 807 in the 1997
amendments to the Rules of Evidence.  *See* Fed. R. Evid. 807 advisory
committee's note.  We therefore refer to the residual hearsay exception as
Rule 807.

[11]  It is undisputed that Mosby satisfies the first prong of the *Mills* test
because the trial court deprived him of the opportunity to present evidence
when it found the tape-recorded statements inadmissible.

the tape-recorded statements could have sufficiently affected the judgment of the jury, as they implicated individuals other than Mosby and his co-defendants in the murder of Officer Hodge. *See Mills*, 956 F.2d 443, 446 (3d Cir. 1992). Although Mosby satisfies the second prong of the *Mills* test, his challenge nonetheless fails because he cannot satisfy the third prong of the test. *See id.*

Because the trial court found Paniagua unavailable, the tape-recorded statements were hearsay and had to qualify as a hearsay exception to be admissible. *See* Fed. R. Evid. 801, 802. Pursuant to Federal Rule of Evidence 804(b)(3), a hearsay statement made by an unavailable declarant can be admitted if, at the time of its making, "it so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Fed. R. Evid. 804(b)(3).[12] The statement must be "sufficiently against [the declarant's] interest so as to be deemed reliable," and this assessment must be made "by viewing [the statement] in

---

[12] The pertinent Virgin Islands rule of evidence tracks the federal rule. Pursuant to V.I. Code Ann. tit. 5, § 932(10), a statement against interest is, in pertinent part, a statement that "at the time of the assertion . . . so far subjected him to civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." V.I. Code. Ann. tit. 5, § 932(10).

context and in light of all the surrounding circumstances."

*United States v. Moses*, 148 F.3d 277, 280 (3d Cir. 1998)

(quoting *Williamson v. United States*, 512 U.S. 594, 603-04

(1994)). If the statement is offered to exculpate the accused,

it is not admissible "unless corroborating circumstances

clearly indicate the trustworthiness of the statement." Fed.

R. Evid. 804(b)(3). For purposes of this inquiry, we will

assume that Paniagua was unavailable, and the only question for

our review is whether the trial court's decision to exclude the

statements for lack of trustworthiness or reliability was made

in error.

When examining whether a statement against interest is

trustworthy and reliable, a court must conduct a "sensitive

analysis of the circumstances in which the statement was made

and the precise nature of the statement." *In re Flat Glass

Antitrust Litig.*, 385 F.3d 350, 373 (3d Cir. 2004) (quoting

*United States v. Boyce*, 849 F.2d 833, 836 (3d Cir. 1988)). In

*Chambers v. Mississippi*, 410 U.S. 284 (1973), the Supreme Court

found that four factors supported the reliability of the

hearsay statements at issue: the statements were made

"spontaneously to a close acquaintance"; each statement was

"corroborated by some other evidence"; the statements were "in

a very real sense self-incriminatory and unquestionably against

interest"; and the declarant was present in the courtroom and could have been subjected to cross-examination. *Id.* at 300-01. Other courts have considered similar factors, including: the relationship between the declarant and the exculpatory party; whether the statement was voluntary; whether there is any evidence that the statement was made to "curry favor" with authorities; whether the declarant's statements are contradictory; and whether other evidence corroborated the statement. *See, e.g.*, *Moses*, 148 F.3d at 280; *Boyce*, 849 F.2d at 836-37; *United States v. US Infrastructure, Inc.*, 576 F.3d 1195, 1208 (11th Cir. 2009); *United States v. Jackson*, 540 F.3d 587, 589 (7th Cir. 2008); *see also United States v. Wilson*, 281 F. App'x 96, 98 (3d Cir. 2008) (examining similar trustworthiness factors under Rule 807).

We find that the trial court's decision to exclude Paniagua's statements complied with Rule 804(b)(3). The trial court considered that Paniagua and SKS were not close acquaintances, but were only involved with one another through drug transactions. *See Chambers*, 410 U.S. at 300; *cf. Wright*, 363 F.3d 237, 246 (3d Cir. 2004) (finding statement made in course of confidential relationship as a factor supporting trustworthiness under the residual hearsay exception); *US Infrastructure, Inc.*, 576 F.3d at 1209 (citing cases for

proposition that statements in course of close relationship supports finding of trustworthiness). The trial court concluded that Paniagua did not make these statements spontaneously, but only after being "baited into a conversation about the murder," as the statements were made during a drug buy unrelated to the Hodge murder. (Trial Tr. vol. 8, 237:5-8); *cf. Thomas v. Varner*, No. 02-4778, 2003 WL 22351294, at *7 (E.D. Pa. June 10, 2003) (finding the fact that declarant made statement against penal interest spontaneously and without encouragement from anyone as a factor supporting admissibility), *aff'd*, 428 F.3d 491 (3d Cir. 2005). The trial court concluded that in this context, Paniagua would have a desire to "sound all powerful" to complete the drug transaction, which weighs against finding the statements trustworthy.[13] (Trial Tr. vol. 8, 237:9-11). Moreover, while under oath, Paniagua denied that it was his voice on the tape

---

[13] The trial court also considered SKS's reliability in its review of the trustworthiness of the tape-recorded statements; however, this factor should not have been considered in the court's analysis because SKS's statements were not at issue. *See United States v. Atkins*, 558 F.2d 133, 135 (3d Cir. 1977) (explaining that a court should only consider the credibility of the declarant, not the credibility of the witness who testifies to the declarant's statements); *see also Padilla v. Terhune*, 309 F.3d 614 (9th Cir. 2002) (adopting the *Atkins* rule). Notwithstanding the trial court's inclusion of this factor, we find that the trial court did not abuse its discretion in finding that the tape-recorded statements were not trustworthy. *See United States v. Smith*, 99 F. App'x 372, 374 (3d Cir. 2004) (noting that district court focused more on credibility of witness than declarant, but nonetheless finding no abuse of discretion in excluding hearsay statements).

or that he ever made these statements, which also casts doubt on the reliability of the tape-recorded statements. *See United States v. Smith*, 99 F. App'x 372, 375 (3d Cir. 2004) (considering the fact that the hearsay statement at issue contradicted a prior statement made by declarant as a factor against reliability); *United States v. Jackson*, 335 F.3d 170, 179 (2d Cir. 2003) (finding that inconsistencies in declarant's statements weighed against a finding of reliability). Finally, the trial court considered the lack of corroborating evidence at trial as a factor weighing against admissibility. In particular, the trial court pointed to the witnesses' testimony that four men were in the vicinity of Hodge's home on the night of the murder, and the evidence that Hodge was shot with four different weapons.[14] (Trial Tr. vol. 8, 237:19-38:1.) The statement on the tape recording that a hitman was hired to kill Hodge is not consistent with this evidence.

Accordingly, we find that the trial court's decision to exclude the tape-recorded statements was not arbitrary or

---

[14] We note that the defense presented some evidence that advanced its theory that the VIPD was responsible for the murder of Officer Hodge, including the testimony of Commissioner Angelo Hill, (Trial Tr. vol. 5, 231:2-15), former Attorney General Rosalie Ballantine, (Trial Tr. vol. 6, 48:11-50:13), Sergeant Reynaldo Fraser, (*id.* at 63:1-66:25, 114:6-23, 142:19-45:20), and Kathleen Lundy, a physical scientist with the FBI (Trial Tr. vol. 8, 109:18-10:13, 121:15-22:5). Despite this evidence, the trial court did not abuse its discretion in finding that the tape-recorded statements were not trustworthy in light of the totality of the circumstances, including the sufficiency of the corroborating evidence at trial.

disproportionate to any legitimate interest.[15]   *See United*

*States v. Hoffecker*, 530 F.3d 137, 184 (3d Cir. 2008) ("A

defendant's interest in presenting such evidence may thus bow

to accommodate other legitimate interests in the criminal trial

process. . . . [Rules of evidence] do not abridge an accused's

right to present a defense so long as they are not arbitrary or

disproportionate to the purposes they are designed to serve."

(quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998))).

Thus, although the tape-recorded statements may have been

favorable and material to the defense, the trial court's

decision to exclude these statements did not result in a

violation of compulsory process, because the statements lacked

sufficient indicia of reliability.[16]   *See Taylor*, 484 U.S. at

---

[15]  Mosby also challenged the trial court's decision to exclude these
statements under the residual hearsay exception, Federal Rule of Evidence
807.  The residual hearsay exception is to be "used only rarely, and in
exceptional circumstances," and "appl[ies] only when certain exceptional
guarantees of trustworthniess exist and when high degrees of probativeness
and necessity are present."  *Wright*, 363 F.3d at 246 (internal quotations
omitted).  Because the tape-recorded statements do not possess sufficient
guarantees of trustworthiness to be admissible under Rule 804(b)(3), the
statements are not admissible under Rule 807, which requires an even higher
guarantee of trustworthiness.

[16]  Mosby also argues that the trial court should have ordered the Government
to disclose the identity of SKS.  "The Government has a 'privilege to
withhold from disclosure the identity of persons who furnish information'
regarding illegal activity."  *United States v. Johnson*, 302 F.3d 139, 148-49
(3d Cir. 2002) (quoting *Roviaro v. United States*, 353 U.S. 53, 59 (1957)).
"A defendant can overcome this privilege if he demonstrates that disclosure
is 'relevant and helpful to his defense' or 'is essential to a fair
determination' of his guilt."  *Id.* at 149 (quoting *Roviaro*, 353 U.S. at 60-
61, and *United States v. Brown*, 3 F.3d 673, 679 (3d Cir. 1993)).  This Court
reviews the trial court's refusal to order disclosure of the confidential

410 (although the right to present a defense is a "fundamental

right," the accused "does not have an unfettered right to offer

testimony that is . . . otherwise inadmissible under standard

rules of evidence").

### B. Motion for a New Trial Pursuant to Federal Rule of Criminal Procedure 33 and Superior Court Rule 135[17]

Mosby argues that the trial court erred by denying his

motion for a new trial pursuant to Federal Rule of Criminal

Procedure 33 and Superior Court Rule 135.[18]  Mosby claims that

the trial court should have granted him a new trial under

Superior Court Rule 135 for two reasons: (1) the trial court's

error in failing to compel the testimony of Paniagua and its

exclusion of the tape-recorded statements had a substantial

---

informant's identity for abuse of discretion.  *Id.*  Mosby only sought the
identity of SKS in order to bring SKS to court to testify to the tape-
recorded statements.  (Trial Tr. vol. 6, 278:21, 279:15-17, 280:11.)
Because we have already affirmed the trial court's decision to exclude these
statements as inadmissible hearsay, Mosby cannot demonstrate a specific need
for SKS's identity.  Thus, we affirm the trial court's refusal to order the
disclosure of SKS's identity.

[17]  Following trial, Mosby filed a motion for judgment of acquittal pursuant
to Federal Rule of Criminal Procedure 29, or in the alternative, for a new
trial pursuant to Federal Rule of Criminal Procedure 33 and Superior Court
Rule 135.  The trial court denied both motions.  (*See* Judge Meyers' Mem. &
Op. 1.)  Mosby does not presently challenge Judge Meyers' ruling on his Rule
29 motion, and therefore he has waived this argument on appeal.

[18]  Because of the similarities between Federal Rule of Criminal Procedure 33
and Rule 135, "we review a denial of a motion for a new trial under Rule 135
using the same standard as federal courts use in reviewing a denial of a
motion for a new trial under Rule 33."  *Stevens v. People of V.I.*, No. 07-
126, 2009 WL 2984057, at *6 n.14 (V.I. Sept. 15, 2009).  In the Superior
Court, Rule 135 governs motions for a new trial, and we therefore consider
Mosby's motion as a Rule 135 motion for a new trial.  *See id.*

influence on the verdict; and (2) the verdict as to all counts was against the weight of the evidence. This Court reviews the denial of a motion for a new trial pursuant to Rule 135 for abuse of discretion. *See United States v. Silveus*, 542 F.3d 993, 1005 (3d Cir. 2008); *see also Stevens*, 2009 WL 2984057, at *6. We consider each of Mosby's challenges in turn and find that both are without merit.

Superior Court Rule 135 provides that a trial court may grant a new trial "in the interest of justice." Superior Ct. R. 135. When a defendant seeks a new trial on the basis of trial error, a new trial is warranted "only when the [] errors so infected the jury's deliberation that they had a substantial influence on the outcome of the trial." *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993) (internal quotations omitted). Mosby argues that the trial court's rulings that Paniagua was unavailable and that the tape-recorded statements were inadmissible had a substantial influence on the verdict. However, because we have already concluded that these rulings were not error, the trial court's decision to deny Mosby's motion for a new trial on the basis of trial court error was not an abuse of discretion.[19]

---

[19] According to Judge Meyers' Memorandum on Mosby's Rule 135 motion, Mosby argued that the following errors committed by the trial court warranted a

Mosby also argues that the jury's verdict was against the weight of the evidence because only three witnesses presented evidence about Mosby - Sellwood, Daniel, and Sorhaindo - and their testimony was not credible and does not support a conviction. "[W]hen a district court evaluates a Rule 33 motion [on the ground that the verdict was contrary to the weight of the evidence,] it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. David*, 222 F. App'x 210, 215 (3d Cir. 2007) (quoting *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)). "However, even if a [trial court] believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial 'only if it believes that there is a serious danger that a miscarriage of justice has occurred - that is, that an innocent person has been convicted.'" *Silveus*, 542 F.3d at 1004-05 (quoting *Johnson*, 302 F.3d at 150). "Such motions are not favored and should be 'granted sparingly and only in

---

new trial: (1) the rulings on Paniagua's availability and the tape-recorded statements; (2) the partial read back of Sorhaindo's testimony; and (3) refusal to disclose the identity of the confidential informant. (Judge Meyers' Mem. & Op. 18-27.) On appeal, Mosby only challenges the trial court's failure to grant a new trial on the basis of its evidentiary rulings, and our review is limited to that challenge. We note that the other alleged errors raised by Mosby are addressed in other parts of this Opinion. *See supra* note 15; *infra* Part III.D.

exceptional cases.'" *Id.* (quoting *Gov't of V.I. v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987)).

The trial court did not abuse its discretion in denying Mosby's motion for a new trial. The trial court properly identified the standard used to assess a Rule 135 motion and conducted an independent review of the Government's evidence in the case. (Judge Meyers' Mem. & Op. 16.) The court concluded that the Government proved the elements of each crime beyond a reasonable doubt. (*Id.*) In its Memorandum and Opinion, the trial court specifically addressed Mosby's argument that Sellwood was not credible because he was granted immunity for testifying, he was a habitual substance abuser, and he received money for his testimony. (*Id.*) The trial court acknowledged that these arguments had some merit but found that they were "not sufficient to discredit" Sellwood's testimony because the court gave the jury instructions to bring these issues to the jury's attention, and the defendants had an opportunity to cross-examine Sellwood about his motives. (*Id.* at 16-17.)

Mosby now argues that Sellwood was not credible because Sellwood first mentioned Mosby's threats to him during his third meeting with the police, and Sellwood never mentioned that Mosby handed Fleming and Vanterpool guns until he testified. However, whether considered to be inconsistencies

between his statements or merely further recollections of the
incident, they were "not so overwhelming as to indicate a risk
that the conviction[s] [were] unjust and merit the court's
intrusion on the jury's function of determining credibility."
*See David*, 222 F. App'x at 216 & n.6 (quoting *United States v.
Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989) ("stating that,
'[i]n general, conflicting testimony or a question as to the
credibility of a witness [is] not sufficient grounds for
granting a new trial . . .'")). Accordingly, we agree with the
trial court and find that Sellwood's testimony supported
Mosby's convictions.

On appeal, Mosby claims that Sorhaindo was not a credible
witness because his out-of-court identification was
unreliable.[20] To determine the reliability of a pretrial
identification, we examine the "totality of the circumstances"
including, "the opportunity of the witness to view the criminal
at the time of the crime, the witness' degree of attention, the
accuracy of the witness' prior description of the criminal, the
level of certainty demonstrated by the witness at the
confrontation, and the length of time between the crime and the

---

[20] Mosby also argues that Sorhaindo's testimony was not credible because the
in-court identification procedure was improperly conducted, and during
summation, the prosecutor improperly argued that Sorhaindo made an in-court
identification of Mosby. We consider each of these arguments in Part III.C
and Part III.F, respectively, and refer to those sections for our analysis.

confrontation."[21]  *Thomas v. Varner*, 428 F.3d 491, 503 (3d Cir.

2005) (quoting *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).

Sorhaindo observed four men dressed in black walk past him in

the direction of Hodge's home on the night of the murder.

Although Sorhaindo provided inconsistent descriptions of the

four men when initially interviewed by the police, once made,

his identification of Mosby never wavered.  Prior to June 21,

1995, the police showed Sorhaindo photo arrays that did not

include a picture of Mosby, and Sorhaindo never made an

identification.  (Pretrial Hr'g Tr. 36:21-37:19.)  When

Sorhaindo was presented with a photo array that included Mosby,

he selected Mosby's photo in less than a minute.  (Pretrial

Hr'g Tr. 51:11.)  At trial, Sorhaindo was presented with the

same photo array and asked to point to the photo that he

selected on June 21, 1995, and he again selected the photo of

Mosby.  (Trial Tr. vol. 2, 35:2-37:12.)  Sorhaindo then pointed

to Mosby as the man in the photograph.  (*Id.* at 38:10-39:5.)

Therefore, Sorhaindo's out-of-court identification of Mosby was

reliable, his testimony thereto was credible, and his testimony

supports the verdict against Mosby.

---

[21]  Under *Neil v. Biggers*, 409 U.S. 188 (1972), a court does not examine the reliability of the pretrial identification unless the pretrial identification procedure was unduly suggestive.  *See Thomas v. Varner*, 428 F.3d 491, 503 (3d Cir. 2005).  For purposes of this inquiry only, we assume that the identification procedure was unnecessarily suggestive.

Mosby also asserts that Daniel was not a credible witness because the jury rejected his testimony that he saw Mosby and Fleming dressed in black hours after the murder, and Daniel had such a brief visit to New York's Latest Fashions on March 26, 1994 that it is unlikely he would remember anything from his encounter.  We disagree.

It is the province of the jury to accept parts of the testimony and reject others. *See United States v. Boyer*, 78 F. App'x 191, 193 (3d Cir. 2003) (quoting *United States v. Boone*, 279 F.3d 163, 169 (3d Cir. 2002) ("A jury is free to believe part of a witness' testimony and disbelieve another part of it.")).  The fact that the jury may not have believed part of Daniel's testimony does not imply that Daniel should be discredited entirely. Moreover, Daniel's testimony about his observations in the store was corroborated by Sellwood, Sorhaindo, and Pennyfeather, who saw men fleeing from the vicinity of Hodge's home with guns.  Accordingly, after reviewing the trial court's independent assessment of the evidence and considering the specific challenges that Mosby has presented on appeal, we find that this case is not one of the "exceptional cases" where a new trial is warranted as the verdict was not against the weight of the evidence.

### C. Motion to Suppress Identifications

Mosby argues that the trial court should have suppressed Sorhaindo's out-of-court photo array identification of Mosby and Sorhaindo's in-court testimony identifying Mosby as the person he previously identified. "[W]e review a decision to admit identification testimony over an objection for abuse of discretion." *United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006) (quoting *United States v. Emanuele*, 51 F.3d 1123, 1127 (3d Cir. 1995)). "Where a motion to suppress has been denied, 'we review the order for clear error as to the underlying facts, but exercise plenary review as to its legality in light of the court's properly found facts.'" *Id.* (quoting *United States v. Inigo*, 925 F.2d 641, 656 (3d Cir. 1991)).

## 1. Out-of-Court Identification

Mosby argues that the trial court erred when it denied his motion to suppress Sorhaindo's out-of-court identification. On June 21, 1995, Sorhaindo was presented with a six picture photo array, and he selected the man in photo number 5 as one of the men he saw on the night of Hodge's murder.[22] Photo number 5 depicted Mosby. (Pretrial Hr'g Tr. 30:7.) On April 19, 1996, the trial court held a suppression hearing and found that the

---

[22] Curtis Griffin, a detective with the FBI task force, testified that he created a six picture photo array that included a photo of Mosby. (Pretrial Hr'g Tr. 20:10-13.)

photo array identification was admissible.  After independently

examining the photo array and hearing the testimony of the

investigating officers, the trial court concluded:

> I do not find anything suggestive about the photo
> array, even though it appears to me that [Mosby's]
> photo appears to be slightly . . . darker than the
> others. But looking at its configuration, looking
> at the configuration of their faces, even though
> Mosby's photo, number five, appears to be slightly
> darker tha[n] the others. He is wearing a dark
> colored T-shirt and that may – that may . . . have
> resulted in his photograph looking a little darker,
> but looking at all these persons, that all have
> long narrow faces.
>
> . . . .
>
> Maybe with the exception of [photo] number two, his
> face might be a little rounder than the others. I
> do not find this photo array in any way suggestive.

(*Id.* at 79:20-80:15.)

A criminal defendant may challenge identification

testimony on the grounds that his Fifth Amendment due process

rights were violated. *See Stovall v. Denno*, 388 U.S. 293, 302

(1967), *overruled on other grounds, Griffith v. Kentucky*, 479

U.S. 314, 326 (1987).  To determine whether a pretrial

identification procedure violated a defendant's due process

rights, we must consider: "(1) whether the identification

process was unduly suggestive, and if so, (2) whether the

totality of the circumstances nonetheless renders the

identification reliable." *Thomas v. Varner*, 428 F.3d 491, 503

(3d Cir. 2005) (quoting *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).  It is the defendant's burden to prove that the identification was unnecessarily suggestive.  *United States v. Mathis*, 264 F.3d 321, 331 (3d Cir. 2001).  "The determination of whether the circumstances give rise to undue suggestiveness must be made on a case-by-case basis, considering the particular conduct in each case." *Varner*, 428 F.3d at 503 (citing *Simmons v. United States*, 390 U.S. 377, 384 (1968)).

Mosby's challenge fails because the trial court properly concluded that the photo array identification was not unduly suggestive, and as we held above, the identification was reliable.  We find nothing suggestive about the number of photos presented to Sorhaindo.  *See United States v. Lawrence*, 349 F.3d 109, 115 (3d Cir. 2003) (six photo array not unduly suggestive).  Additionally, while a photo array displaying persons of markedly different skin tone or ethnicity may be unduly suggestive, the fact that Mosby's photograph or complexion appeared slightly darker than the other photographs does not make the array unduly suggestive. *See Reese v. Fulcomer*, 946 F.2d 247, 260 (3d Cir. 1991), *superseded on other grounds by statute*, 28 U.S.C. § 2254(d) ("[P]hotographic displays have been held not unduly suggestive even when certain characteristics of the defendant or his photograph are set

apart from the others."). Moreover, none of the evidence adduced at trial reveals any indication that the police officers who conducted the photo array employed a suggestive procedure. Thus, we affirm the trial court's decision to deny Mosby's motion to suppress Sorhaindo's out-of-court identification.

### 2. In-Court Identification

Mosby also challenges Sorhaindo's in-court identification of Mosby as the person he previously identified. Mosby's trial counsel did not object to this testimony at trial. While we review a trial court's decision to permit an in-court identification over an objection for abuse of discretion, *Phillips v. People of V.I.,* No. 07-237, 2009 WL 707182, at *3 (V.I. Mar. 12, 2009) (citing *United States v. Wise*, 515 F.3d 207, 215 (3d Cir. 2008)), in the absence of an objection, we review the trial court's decision for plain error, *United States v. Jones*, 126 F. App'x 560, 567 (3d Cir. 2005). Like an out-of-court identification, an in-court identification is admissible unless the procedure was "so unnecessarily suggestive as to give rise to a substantial likelihood of irreparable misidentification that admitting the identification testimony would be a denial of due process." *United States v.*

*Clausen*, 328 F.3d 708, 731 (3d Cir. 2003) (citing *Mathis*, 264 F.3d at 330).

At trial, Sorhaindo was presented with the same photo array and chose Mosby's photo as the picture he had previously selected. (Trial Tr. vol. 2, 35:2-37:12.) Sorhaindo then pointed to Mosby, identifying him as the man in the photo. (*Id.* at 38:10-39:5.) The fact that Sorhaindo was unable to identify Mosby from memory does not render inadmissible Sorhaindo's testimony to his out-of-court identification. *See Clausen*, 328 F.3d at 713-14 (finding no error where trial court allowed witnesses that could not make in-court identification to testify to out-of-court identification); *Gov't of V.I. v. Petersen*, 507 F.2d 898, 902 (3d Cir. 1975) (same). The identification did not follow labored questioning and the identification was not coached or prodded. (Trial Tr. vol. 2, 35:2-39:5.) Moreover, Mosby's counsel did not object to the photo identification. (*Id.*) Accordingly, we find nothing unnecessarily suggestive about Sorhaindo's in-court identification.

**D. Read-Back of Sorhaindo's Testimony**

Mosby argues that the trial court erred when, at the jury's request, it permitted a read-back of a portion of Sorhaindo's direct testimony but did not read back related

cross-examination testimony. During deliberations, the jury requested a "copy of Mr. Sorhaindo's testimony" and specified a portion of the testimony they wanted to hear.[23] (Trial Tr. vol. 10, 3:17-20, 4:3-4, Aug. 17, 1996.) Initially, counsel for Mosby's co-defendant, Pedro Harris, stated that "it's only fair that the jury be read the whole testimony." (*Id.* at 3:21-23.) The trial judge responded that he "[didn't] want to force them to sit down here all day," and they will be read "only what they want to hear," (*id.* at 4:4-5), and counsel for Mosby and Harris agreed, (*id.* at 4:6-18). The trial judge brought the jury into the courtroom and the court reporter read back the relevant portion of Sorhaindo's testimony. The jurors told the court reporter when to stop reading, and all of the jurors indicated that the read-back was satisfactory. (*Id.* at 5:3-6:5.)

We review the trial court's decision to read back testimony to the jury for abuse of discretion. *United States v. Shabazz*, 564 F.3d 280, 285 n.3 (3d Cir. 2009) (citing *United States v. Zarintash*, 736 F.2d 66, 69-70 (3d Cir. 1984)). A trial judge has wide discretion in deciding whether or not to read back testimony to the jury at their request. *Id.* at 285.

---

[23] The record does not indicate what portion of the testimony was requested and read.

Denial of such a request must be based on concerns with slowing
down the trial or causing the jury to place undue emphasis on
the read-back testimony. *Id.* Thus, when a jury requests to
hear only a portion of testimony, a trial court must be aware
that "reading only a portion of the testimony may cause the
jury to give that portion undue emphasis." *United States v.
Wright-Barker*, 784 F.2d 161, 174 (3d Cir. 1986), *superseded on
other grounds by statute*, *United States v. Martinez-Hidalgo*,
993 F.2d 1052 (3d Cir. 1993). However, "[t]here is no
inflexible rule requiring the court to read cross-examination
testimony of the witness whose testimony is read to the jury."
*United States v. Kennedy*, 46 F. App'x 200, 200-01 (4th Cir.
2002) (holding that each case is decided on its facts).

Here, the jury requested to hear only a portion of the
testimony, and the trial court acted properly when it allowed
the jury to hear only that portion. *See Wright-Barker*, 784
F.2d at 174 (a trial court has no obligation to continue a
read-back after jurors have expressly indicated that they have
heard enough). The trial court indicated that it did not wish
to slow down the trial. In addition, while Mosby argues that
the jury must have been confused regarding Sorhaindo's
testimony because the prosecutor in his closing argument stated
that Sorhaindo made an in-court identification of Mosby, we

have independently reviewed the entirety of Sorhaindo's
testimony, and we find no portion of his direct examination
that could have confused the jury on this point.  Accordingly,
the trial court did not err when it read back only the portion
of the testimony that the jury requested to hear.  *See United*
*States v. Bennett*, 75 F.3d 40, 45-46 (1st Cir. 1996) (finding
no abuse of discretion where defendant failed to show why it
was unfair to read back direct examination but not cross
examination).

### E. Alleged *Bruton* Violation

Citing *Bruton v. United States*, 391 U.S. 123 (1968), Mosby
argues that the trial court erred by denying his pretrial
motion for severance and by not granting a mistrial at various
points during the trial.  In *Bruton*, the Supreme Court held
that a defendant's Sixth Amendment right to confront adverse
witnesses is violated by the admission of a non-testifying
codefendant's confession which implicates other defendants.
391 U.S. at 135-36.  In this context, due to the risk that a
jury will not follow limiting instructions, the defendant's
right to confront adverse witnesses is violated even if the
trial court instructs the jury that the statement is to be
considered evidence only against the confessing defendant.  *Id.*
at 135.  Therefore, in order to avoid a *Bruton* violation, a

prosecutor trying a multi-defendant case must redact the

confession "to eliminate not only the [codefendant's] name, but

any reference to his or her existence." *Richardson v. March*,

481 U.S. 200, 211 (1987). In addition, a confession that is

altered in such a way that it obviously implicates a

codefendant or notifies the jury that a name has been deleted

falls within the class of statements prohibited by *Bruton*.

*Gray v. Maryland*, 523 U.S. 185 192 (1998).

Mosby's arguments relate to Maurice Richardson's out-of-

court confession to Athnell Coker. The record on appeal

includes an unredacted written statement that appears to have

been taken from Coker by VIPD. (Appellant's App. II, 92-95.)

In that statement, Coker recounted a conversation with

Richardson during which Richardson admitted his involvement in

the murder of Officer Hodge. According to Coker's statement,

Richardson also stated that "3 other guys" were involved in the

murder: "[o]ne named Money G, Carlos, [and] I don['[t know the

other guy['[s name." (Appellant's App. II, 92.) In addition,

according to Coker, Richardson said that the four participants

went to Hodge's house, waited for him to come home, called

Hodge out of his house, and then shot him. Before trial, Mosby

filed a motion for relief from prejudicial joinder based on

this statement. According to Mosby, the motion was denied but

the trial court ordered redaction of all references to Mosby in Coker's statement.[24]  Mosby argues that the trial court erred by denying his motion for severance.

In addition, Mosby argues that various *Bruton* violations occurred throughout the trial.  According to Mosby, the first violations can be found in the prosecutor's opening statement.  During his opening statement, the prosecutor described his case as proceeding in three phases, the last of which would include the testimony of "three men who broke the code of silence" and, by doing so, "nailed this case shut" and "provided the corroboration that enable[d] the Government to make the arrest[s] against the men that are seated" at the defense table.  (Trial Tr. vol. 1, 74:14-22.)[25]

Mosby also argues that *Bruton* violations occurred during the prosecutor's closing argument.  During his closing, the prosecutor referred to Richardson's testimony as coming from "the mouth of babes" and referred to Richardson as "the one who couldn't keep his mouth shut."  (Trial Tr. vol. 9, 38:16-19.)

---

[24] The trial court's order is not part of the record.

[25] In addition, the prosecutor observed what he described as the "ultimate criminal paradox," which can be summarized as a criminal's compulsion to reveal his or her crimes.  (*Id.* at 94:13.)  He then applied this general observation to this case, stating that a confession came "out of the mouth of babes" and that "the evidence in the case will show that it was the youngest of the defendants, Maurice Richardson, at the time 17 years old, and he was the one that simply could not resist the temptation to talk." (*Id.* at 94:21-25.) Mosby did not object to the prosecutor's opening statement.

When the prosecutor recalled Richardson's confession to Coker, the prosecutor summarized the confession as follows: "They make sure he is home---and out of the mouth of babes again---that guy over there that couldn't keep his mouth shut, he says they hid in the bushes." (*Id.* at 40:18-22.) Finally, the prosecutor described the encounter between Sellwood, Mosby, Fleming, and Vanterpool, during which Mosby said to Sellwood, "When my boys them come to you, you got to have something, and if I hear anything about what you heard in that store, I'm going to take you out." (*Id.* at 62:14-17.) According to the prosecutor, this encounter left Sellwood worrying, "I got to get out of here because home boy, Mr. Big Mouth is talking at the same time and Mosby is going to think it was me because Mr. Big Mouth is running his mouth." (*Id.* at 62:21-24.)

At the outset, we reject Mosby's *Bruton* arguments premised on the prosecutor's statements because "arguments of counsel are simply not evidence" and as such, cannot form the basis of a *Bruton* violation. *See U.S. v. Quintero*, 38 F.3d 1317, 1342 (3d Cir. 1994); *see also United States v. Sandini*, 888 F.2d 300, 311 (3d Cir. 1989)("We have, [], never held that *Bruton* applies [when an attorney] implicates a defendant during a closing argument and we perceive of no reason to do so because the arguments of counsel are simply not evidence. . ."); *see*

*also Band v. Beard*, 539 F.3d 256, 275 (3d Cir. 2008)(concluding that prosecutor's statements were "harmless-error" and affirming lower court's ruling, which held that, "opening statements do not constitute evidence").

Mosby also points to Coker's testimony at trial. Before Coker testified and outside the presence of the jury, the trial court instructed the prosecutor to ensure that Coker's testimony did not implicate any of the defendants except Richardson. (Trial Tr. vol. 5, 32:4-15.) When Richardson took the stand, the prosecutor began direct examination by asking several introductory questions, and the introduction included a general inquiry into Coker's relationship with the defendants as well as an opportunity for Coker to identify the defendants. (*Id.* at 36:7-39:21.) The prosecutor then focused on Coker's relationship with Richardson in greater detail, and the prosecutor subsequently began to inquire into the conversation that Coker had with Richardson about the murder of Officer Hodge. During Coker's testimony about the conversation, Coker stated that Richardson said "they" staked out Hodge's house, waited until Hodge came out, and then shot him. (*Id.* at 44:24-45:15.) No defendant objected to Coker's use of the word "they." The prosecutor subsequently asked if Richardson said how many people were involved in the murder and what kinds of

weapons were used, but the questions were not answered because

the trial court sustained objections that were raised by

Mosby's trial counsel.  (*Id.* at 46:20, 47:21.)  After

sustaining the objections, and then again later in Coker's

testimony, the trial court instructed the jury that Coker's

testimony was admitted only against Richardson and not against

any other defendant.  (*Id.* at 47:11-14, 65:15-19.)  When the

prosecutor rested, Mosby's counsel moved for a mistrial based

on the two questions that were asked but not answered, arguing

that the prosecutor intended to "leave a certain inference in

the jury's mind by asking those questions." (*Id.* at 74:14-

75:4.)  The trial court denied the motion.  We will address in

turn Mosby's arguments that the trial court erred by denying

his pre-trial motion for severance and by not granting a

mistrial.

## 1. Pretrial Motion for Severance

We turn first to Mosby's argument that the trial court

erred by denying his pretrial motion for relief from

prejudicial joinder.  Because joint trials promote efficiency

and serve the interests of justice, a trial court's denial of a

motion to sever is reviewed for abuse of discretion.  *United

States v. Lore*, 430 F.3d 190, 205 (3d Cir. 2005) (citing *United

States v. Urban*, 404 F.3d 754, 762 (3d Cir. 2005)); *see also*

*Gov't of V.I. v. Edwards*, 59 F. App'x 470, 475 (3d Cir. 2003).

However, "[s]everance should generally be granted if the

defendant would be prejudiced by introduction of an inculpatory

prior statement of a codefendant." *United States v. Veras de

los Santos*, 184 F. App'x 245, 256 (3d Cir. 2006) (citing *Zafiro

v. United States*, 506 U.S. 534, 537 (1993)).  In determining

whether the trial court erred by denying Mosby's request for

severance, we review the record as it existed when the trial

court made its determination, as well as subsequent

developments at trial that were reasonably foreseeable prior to

trial.  *United States v. Sandini*, 888 F.2d 300, 305-06 (3d Cir.

1989); *see also United States v. Scott*, 266 F. App'x 206, 208

(3d Cir. 2008) (stating that in reviewing a challenge based on

severance, "we must first determine from the record, as it

existed when the motion was made, what trial developments were

then reasonably foreseeable, and in that light decide whether

the district court abused its discretion in denying the

severance motion" (quoting *United States v. McGlory*, 968 F.2d

309, 340 (3d Cir. 1992))).

The unredacted version of Coker's testimony obviously

implicated Mosby and would therefore have been inadmissible

against Mosby.  The trial court, rather than ordering

severance, ordered the redaction of all references to Mosby.

As observed above, *Bruton* does not require severance where a statement can be redacted to eliminate all references to a coconspirator. Mosby does not argue that the statement was incapable of redaction, nor does he argue that he requested any specific redaction. Instead, he bases his argument entirely on developments at trial, but he makes no attempt to convince this Court that the developments were reasonably foreseeable prior to trial. Accordingly, Mosby has failed to convince this Court that the trial court abused its discretion when it denied Mosby's request for severance.

### 2. Motion for Mistrial

Mosby also argues that the trial court should have granted a mistrial at various points during the trial. In general, we exercise plenary review when a defendant's challenge implicates the Confrontation Clause. *United States v. Delgado*, 289 F. App'x 497, 501 (3d Cir. 2008) (citing *United States v. Mitchell*, 145 F.3d 572, 576 (3d Cir. 1998)). Thus, where a *Bruton* error occurs and is properly preserved at trial, we will affirm only if the error is harmless beyond a reasonable doubt. *United States v. Richards*, 241 F.3d 335, 341 (citing *United States v. Helbling*, 209 F.3d 226, 241 (3d Cir. 2000)). However, if a defendant fails to preserve an issue that he or she claims warranted a mistrial, we review only for plain

error. *Richards*, 241 F.3d at 342 (citing Fed. R. Crim. P. 52(b)). "[I]t is risky business for a judge on his own motion to declare a mistrial, as the defendant may thereafter contend that he was entitled to a completion of the first trial so that a retrial is barred by double jeopardy principles." *Sandini*, 888 F.2d at 309 (citing *Arizona v. Washington*, 434 U.S. 497, 503-04 (1978)). "[T]he defendant who, without asking for a mistrial gets one, will surely argue, and not unreasonably, that if he did not . . . regard the alleged error as serious enough even to prompt his reaction, a court is effectively granting a mistrial over his objection . . . ." *Id.* (citing *Arizona*, 434 U.S. at 505). Thus, even "where defense counsel objects but fails to request a mistrial, we review failure to grant a mistrial for plain error only." *United States v. George*, 209 F. App'x 142, 147 (3d Cir. 2006) (citing *Richards*, 241 F.3d at 341).

We will begin our review of the trial court's failure to grant a mistrial with the only occasion that Mosby's counsel actually requested a mistrial. After the prosecutor finished questioning Coker, Mosby's counsel requested a mistrial based on the prosecutor's attempt to ask Richardson how many people were involved in the murder and what kinds of weapons were used. The trial court denied the request for a mistrial.

However, as pointed out above, these questions were not answered because the trial court sustained objections that were raised by Mosby's trial counsel. After sustaining the objections, and then again later in Coker's testimony, the trial court instructed the jury that Coker's testimony was admitted only against Richardson and not against any other Defendant. Because the questions were not answered and the trial court issued an immediate curative instruction, we find no error in the trial court's decision denying a mistrial. *See United States v. Quintero*, 38 F.3d 1317, 1340 (3d Cir. 1994) (finding no *Bruton* violation where court sustained objection and issued curative instruction in response to question asking whether confessing defendant implicated codefendant).

We now turn our attention to the occasions that Mosby claims warranted a mistrial even though he did not request one at trial. First, Mosby argues that Coker's testimony on its face improperly implicated Mosby in violation of *Bruton* because Coker used the word "they" when he recounted Richardson's confession. Mosby did not object to Coker's use of the word "they" until the prosecutor restated Coker's testimony during his closing, and even then, Mosby's counsel incorrectly asserted that Coker did not use the word "they." Trial Tr. vol. 9, 131:2-7.) Mosby did not request a mistrial on this

ground, and we find that the trial court did not err when it elected not to *sua sponte* grant a mistrial because Coker's testimony did not obviously implicate Mosby or notify the jury that Coker's testimony was limited. Coker did not refer to Mosby by name, nickname, description, or in any other way that facially implicated Mosby. While it is certainly possible that the use of a neutral pronoun in place of a defendant's name may in context permit the jury to infer that the testimony refers to the defendant, the mere possibility of such an inference is not sufficient to warrant a *sua sponte* mistrial. *See Priester v. Vaughn*, 382 F.3d 394, 399 (3d Cir. 2004) (finding no *Bruton* violation where the inference was possible but not a "foregone conclusion"). The reference to the defendant must be direct or obvious, and the inference must be unavoidable. *See United States v. Hardwick*, 544 F.3d 565, 573 (3d Cir. 2008) (finding *Bruton* violation where the "unavoidable inference" was that the redaction referred to the nonconfessing defendants); *Richards*, 241 F.3d at 341 (finding *Bruton* violation where the redaction "sharply incriminated" the nonconfessing defendant). Coker's use of the word "they" did not directly or obviously implicate Mosby. The word "they" does not draw attention to any particular individual, and it is nonspecific as to the number of people involved in the murder. *See United States v. Smith*,

140 F. App'x 349, 351-52 (3d Cir. 2005) (discussing use of the term "individuals"). The fact that the term is nonspecific as to the number of people involved is especially important in this case because all five Defendants were on trial for the murder of Officer Hodge, but two witnesses testified that they only saw four individuals walking either to or from the scene of the murder. *Compare Priester*, 382 F.3d at 399 (no violation where at least fifteen perpetrators were involved in a shooting and statement used substitutions including "the other guy," "someone," "someone else," "the guy," and "another guy"), *with Vazquez v. Wilson*, 550 F.3d 270, 280-81 (3d Cir. 2008) (finding violation where statement indicated that there were only two possible shooters, there were only two men on trial, and defendant's name was replaced with "my boy" or "other guy"), *Hardwick*, 544 F.3d at 573 (finding violation where only two defendants were charged with murder, statement limited possible culprits to the two defendants charged with murder, and their names were replaced with the word "others"), *Richards*, 241 F.3d at 341 (finding violation where only two defendants were on trial and redacted statement implicated three participants in the crime, including the confessing defendant, an "inside man" who was not on trial, and a man who was referred to as "my friend"). Finally, Coker's use of the word "they" did not draw

attention to the redaction as it was consistent with other

evidence introduced at trial that indicated that the murder was

committed by multiple individuals. *See United States v.*

*Edwards*, 159 F.3d 1117, 1125-26 (8th Cir. 1998) (observing that

"referring to joint activity by use of the pronouns 'we' and

'they,' or by use of indefinite words such as 'someone,' does

not draw attention to the redaction and thus, in most

situations, will not be incriminating unless linked to a

codefendant by other trial evidence"). Accordingly, we find

that the trial court committed no error, much less plain error,

when it did not grant a mistrial after Coker used the word

"they" in his testimony or when the prosecutor repeated the

statement in his closing argument.

## F. Prosecutorial Misconduct

Mosby argues that "[t]he Government engaged in

prosecutorial misconduct from their opening statement to the

summation . . . ." (Appellant's Br. 43.) Although Mosby

baldly asserts wide-ranging misconduct, his specific challenges

focus primarily on the prosecutor's opening statement and

closing argument. Mosby contends that, during his opening

statement and closing argument, the prosecutor violated *Bruton*,

argued false evidence to the jury, appealed to the passions of

the jury, referred to "sensational and misleading news

articles," implored the jury to send a signal with their verdict, violated Mosby's right to remain silent, and improperly shifted the burden of proof. (*Id.* at 44-49.) Mosby argues that the prosecutor's improper remarks amounted to misconduct resulting in a "'manifest miscarriage of justice,' thereby depriving [him] of his right to a fair trial." (*Id.* at 43.)

We review the trial court's rulings on any contemporaneous objections to prosecutorial misconduct for abuse of discretion. *United States v. Brennan*, 326 F.3d 176, 182 (3d Cir. 2003). Under this standard, "[a] finding of prosecutorial misconduct requires reversal unless the error is harmless." *Id.* "In judging whether improper remarks are harmful, we consider 'their scope, their relation to the context of the trial, the ameliorative effect of any curative instructions and the strength of the evidence supporting the conviction.'" *United States v. Weekes*, 224 F. App'x 200, 204 (3d Cir. 2007) (quoting *United States v. Rivas*, 479 F.3d 259, 267 (3d Cir. 2007)). We review any non-contemporaneous objections to prosecutorial misconduct under the plain error standard. *Brennan*, 326 F.3d at 182. "In order to demonstrate prosecutorial misconduct under a plain error standard, the review must reveal 'egregious error or a manifest miscarriage of justice.'" *Id.* (internal

citations omitted); *see also United States v. Williams*, 134 F.
App'x 510, 514 (3d Cir. 2005) ("In order to be plain error, an
error must not only be 'obvious,' it must 'have affected the
outcome of the [lower court] proceeding.'") (internal citations
omitted).  Again, "[a]ny claim of prosecutorial misconduct must
be viewed 'in context' 'against the entire record.'"  *United
States v. Voneida*, 337 F. App'x 246, 250 (3d Cir. 2009)
(quoting *United States v. Young*, 470 U.S. 1, 16-17 (1985)).

"Prosecutorial misconduct results in a violation of due
process when the conduct 'so infected the trial with unfairness
as to make the resulting conviction a denial of due process.'"
*Williams*, 134 F. App'x at 514 (quoting *Donnelly v.
DeChristoforo*, 416 U.S. 637, 643 (1974)).  Mosby's objections
focus primarily on statements made during the prosecutor's
opening statement and closing argument.  "[A] prosecutor is
entitled to considerable latitude in summation to argue the
evidence and any reasonable inferences that can be drawn from
that evidence." *United States v. Price*, 346 F. App'x 796, 803
(3d Cir. 2009) (internal citations omitted).  However,
"prosecutors have a special and solemn duty to refrain from
improper methods of obtaining a conviction." *United States v.
Morena*, 547 F.3d 191, 193 (3d Cir. 2008) (quoted in *Smith v.
Gov't of V.I.*, App. No. 2005-23, 2009 WL 1097527, at *10

(D.V.I. Apr. 17, 2009)).  Accordingly, "a prosecutor 'may

prosecute with earnestness and vigor – indeed, he should do so.

But, while he may strike hard blows, he is not at liberty to

strike foul ones.'"  *Id.* (quoting *Berger v. United States*, 295

U.S. 78, 88 (1935)).  We are mindful that "a criminal

conviction is not to be lightly overturned on the basis of a

prosecutor's comments standing alone, for the statements or

conduct must be viewed in context; only by so doing can it be

determined whether the prosecutor's conduct affected the

fairness of the trial."  *United States v. Lore*, 430 F.3d 190,

210 (3d Cir. 2005) (quoting *Young*, 470 U.S. at 11).  We now

turn to the proper standard of review in this case and the

specific instances of alleged prosecutorial misconduct.

## 1. Standard of Review

The parties disagree as to the proper standard of review

on this issue.  Mosby contends that his trial counsel made

contemporaneous objections to the prosecutor's conduct, thus

the proper standard of review is abuse of discretion.  The

Government argues that Mosby's counsel failed to object

contemporaneously and thus the proper standard of review is

plain error.  Mosby relies on an objection that was made by

trial counsel at the end of Defendant Richardson's closing

argument, outside of the presence of the jury.  *See Brennan*,

326 F.3d at 185 (considering an objection made during a break

in the summation a contemporaneous objection). Mosby's

attorney stated:

> I'll be brief. My objection is to the Government's
> summation in which he indicated that Mr. Richardson
> said that they committed this crime when, as Your
> Honor knows, with the rulings that were in the case,
> that was not the issue or the testimony.
>
> Also I just want to preserve for appeal, if there is
> one in the case, the Government's mischaracterization
> of the evidence. I think it was extremely prejudicial
> and went beyond just a few problems, so I want to
> preserve those for the record, Judge.

(Trial Tr. vol. 9, 131:2-13, Aug. 16, 1996.) The trial judge

responded, "I cannot remember what he said, but if that is what

he said then you have preserved it for the record." (*Id.* at

131:14-16.) The Government also notes that Mosby's trial

counsel placed a final objection on the record after the judge

had instructed the jury. Trial counsel stated:

> I want to make an objection just for the record as to
> the rebuttal which were comments on the credibility
> of my client, but my client never testified. I want
> to make sure it's preserved for the record and I want
> the record to be clear that this is the first
> opportunity that I had to put the objection on the
> record.

(Trial Tr. vol. 9, 277:22-78:3.)

This Court notes that at no point did Mosby's counsel move

for a mistrial or request a curative instruction. Moreover,

trial counsel's general challenge to the Government's

"mischaracterization of the evidence" failed to provide

sufficient notice to the trial judge as to the substance of the

objection. Mosby's trial counsel did object to the

prosecutor's alleged comment on Mosby's right to remain silent

and to the prosecutor's use of the word "they" when summarizing

Richardson's confession to Coker. We therefore review these

two specific challenges under the abuse of discretion standard;

however, Mosby's trial counsel never objected to the remaining

statements that he now claims constitute prosecutorial

misconduct, and we therefore review all other objections under

the plain error standard. *See Weekes*, 224 F. App'x at 203

(reviewing objections to prosecutorial misconduct in the same

appeal under two different standards depending on whether a

specific objection was made at trial); *Lore*, 430 F.3d at 210

n.18 (same); *Brennan*, 326 F.3d at 185-86 (same).

## 2. Alleged *Bruton* Violation

Mosby argues that the prosecutor improperly used Defendant

Richardson's confession to Coker against Mosby, thereby

violating the trial court's *Bruton* ruling. Mosby's argument

focuses on remarks made during the prosecutor's opening

statement and closing argument. (*See* Appellant's Br. 44-45

(quoting Trial Tr. vol. 1, 74:14-19; Trial Tr. vol. 9, 38:16-

19, 40:18-22, 62:21-24).) Specifically, Mosby contends that

the prosecutor's statements suggested that Defendant

Richardson's confession led to the arrests of the other

defendants and that the confession implicated the other

defendants. As we discussed *supra* in Part III.E, we disagree

with Mosby's characterizations, and find that the prosecutor's

statements did not violate *Bruton*. We rely on our treatment of

these statements in Part III.E, and accordingly, we find that

the trial court did not abuse its discretion, much less commit

plain error, as there was no misconduct with respect to the

alleged *Bruton* comments.

### 3. Alleged Misstatements of the Evidence

Mosby claims that "[t]he prosecutor continually argued

false evidence to the jury." (Appellant's Br. 45.) "As noted

by the Supreme Court in *Darden*, when a prosecutor's argument

manipulates or misstates the evidence, the argument can be so

prejudicial as to result in the denial of due process." *Moore*

*v. Morton*, 255 F.3d 95, 118 (3d Cir. 2001) (citing *Darden v.*

*Wainwright*, 477 U.S. 168, 182 (1986)). Mosby claims that the

prosecutor misstated the evidence by arguing that: (1) there

were eyewitnesses to the murder, specifically Sorhaindo and

Hodge's mother; (2) Sorhaindo made an in-court identification

of Mosby; and (3) "95 to 90 percent of the time there are never

fingerprints found on shell casings." (Appellant's Br. 46.)

As Mosby's trial counsel failed to contemporaneously object to
these specific statements, we review them for plain error.

We find that the prosecutor's statements did not obviously
suggest that there were eyewitnesses to the murder.[26] The
prosecutor's statements referred generally to "horrors" that
the witnesses saw, including Mrs. Hodge's observation of her
son's body, but did not necessarily refer to the horror of
observing the shooting itself. While we agree that the
prosecutor's statement that "[n]o one asked [Sorhaindo] to be
standing there at the Church so that he could watch the
murder[,]" (*see* Trial Tr. vol. 9, 29:20-21), was inaccurate, we
do not find that this statement provides a cognizable basis for
reversible error. Indeed, this statement was imprecise and
overbroad. However, it does not constitute plain error,
particularly because the prosecutor openly acknowledged in his

---

[26] Mosby directs the Court's attention to the following statements by the
prosecutor:

> I have the opportunity to prepare the people who are going to come
> through the door to take the stand and tell their story. They're
> going to talk about the horror that they witnessed.

> You could be a young lame punk, amateur, anybody can stand in front of
> an object that big, that close and blow a man away and wipe his life
> out. That is what Mrs. Hodge saw. What time did it happen? She
> called the police by 12:17 a.m., March 27, 1994. That is what she
> saw.

(Appellant's Br. 45-46 (quoting Trial Tr. vol. 1, 70:24-71:3, and Trial Tr.
vol. 9, 33:17-22).)

closing argument that there were no eyewitnesses to the actual shooting.  (*Id.* at 26:2-11.)

Similarly, we find that the prosecutor did not suggest that Sorhaindo made an in-court identification of Mosby.  Two of the comments cited by Mosby simply state that Sorhaindo identified Mosby.[27]  This is a true statement as Sorhaindo previously identified Mosby from a photo array.  The prosecutor's statement that "[Sorhaindo] stood back here and kind of – that guy [Mr. Mosby] right there and on the record an in-court identification was made of the second man that he saw that night walking right here dressed in all black[,]" (Trial Tr. vol. 9, 25:12-15), does seem misleading when taken out of context, however, in context it is clear that the prosecutor is

---

[27]  Mosby directs the Court's attention to the following statements:

> So Eustace picked out two of the five men that are charged with Stephen Hodge's murder, [Pointing] him [Mr. Mosby] and him [do-defendant Harris].

> [W]e have the two other Defendant[s] sitting right there that were also positively identified by face.

(Appellant's Br. 45 (quoting Trial Tr. vol. 9, 25:22-24, 26:21-23).)  Unlike Harris, Mosby only quotes a portion of the prosecutor's first statement. The entire remark suggests that Sorhaindo "picked out" Mosby and Harris "within minutes of the murder."  (Trial Tr. vol. 9, 25:24.)  Mosby does not explicitly challenge the portion of the comment that deals with the timing of the identification.  However, this Court notes that the prosecutor did misstate the timing of Sorhaindo's out-of-court identification of Mosby. Nonetheless, this error was not egregious nor did it result in a manifest miscarriage of justice with respect to Mosby because, unlike Harris, Sorhaindo did in fact identify Mosby prior to trial and, therefore, the misstatement as to the precise timing, while careless, does not constitute plain error.

describing Sorhaindo's testimony and the fact that he

identified Mosby in-court as the person that he had previously

identified in the photo array.  The portion of the argument

immediately preceding this excerpt reads:

> Do you see anyone in the array that you saw that
> night?  He took the array.  And point your finger to
> it.  And before he pointed the finger the Judge said
> is there a number behind it?  Yes.  What number was
> it?  Number 5 and who was in that picture?  This guy
> right here.  Get a good look at him.  That guy right
> there was picked out in June '95 in a photo array by
> Eustace Sorhaindo indicating that he was one of the
> four men that walked past him in all black towards
> Steven Hodge's home.  Then what happened after that?
> Okay, Mr. Sorhaindo, do you see the person in the
> courtroom that was in that photograph.  He acted real
> nervous when he was asked to get down from the stand
> again and he walked over and he didn't want to get
> that close.  He was able to get up to here when he
> picked out Pedro.  He was pretty close but when it
> came to Gent Mosby, he didn't want to get that close.

(*Id.* at 24:18-25:11.)  In context, it is clear that the

prosecutor was describing Sorhaindo's testimony and the fact

that he identified Mosby as the man that he had previously

identified.  Thus, we do not find that these statements

constituted clear misconduct.

Finally, the prosecutor did improperly state that "95 to

90 percent of the time there are never fingerprints found on

shell casings," (Trial Tr. vol. 9, 69:21-23), because there was

no evidentiary basis for this comment in the evidence presented

in this case.  However, this misstatement did not result in a

manifest miscarriage of justice.  In the context of the entire record, this remark was an inconsequential comment.  As is discussed *supra* in Part III.B as well as *infra* in Part III.F.6, there was sufficient evidence to convict Mosby even in light of this statement.

### 4. Prosecutor's Alleged Attempts to Inflame the Jury and Appeal to Their Passions

Mosby argues that "[t]he prosecutor . . . appealed to the passion of the jury and the sensational and misleading news articles that all of the jurors had been reading for many months." (Appellant's Br. 47.)  Mosby contends that the prosecutor played on the fact that Mosby was not from St. Thomas, improperly suggested that witnesses had been threatened, and urged the jury to "send a signal" with their verdict.  (*Id.* at 47-48.)  Generally, a prosecutor should not make comments calculated to inflame the passions or prejudices of the jury. *See Weekes*, 224 F. App'x at 208.  We review these instances of alleged misconduct for plain error.

We find that, although the prosecutor did call attention to the fact that this case had been widely covered by the media, the prosecutor also implored the jurors to put aside whatever they had heard and instead decide the case on the facts presented at trial. (*See* Trial Tr. vol. 1, 70:13-23.)

Similarly, we find that the prosecutor's references to St.
Thomas do not constitute plain error.  The prosecutor's remark
about "deceiv[ing] the people of St. Thomas," (*see* Trial Tr.
vol. 9, 25:15-17), was rhetoric, and while it was perhaps
distasteful, it does not amount to egregious error.  Similarly,
the prosecutor's repeated references to Mosby's statement that
he "ain't doing no time in no [little] fucking country jail[,]"
(*See* Appellant's Br. 47), were not obvious attempts to exploit
the fact that Mosby was not from St. Thomas.  Rather, these
statements were an attempt by the prosecutor to establish
Mosby's confidence and his leadership role, (*see* Trial Tr. vol.
9, 45:18-46:4), as well as an admission of guilt by Mosby, (*see*
*id.* at 60:6-18, 61:8-24).  These statements were neither
egregious nor did they result in a manifest miscarriage of
justice.  Mosby's argument that the prosecutor's comment that
"[the arrests of the defendants were based] on the courage of
the witnesses themselves that take that stand and tell you
their story[,]" improperly suggests that the witnesses had been
threatened also fails.  (*See* Appellant's Br. 47 (quoting Trial
Tr. vol. 1, 92:22-24).)  Mosby was convicted of threatening a
witness, Gwentin Sellwood.  While the use of "witnesses" plural
was inaccurate, it was not plain error.  Finally, the
prosecutor's statement that Hodge was writing back from his

death was certainly an ill-advised rhetorical flourish, but it was not plain error. In context, it appears that the prosecutor was commenting on the ironic nature of Hodge writing Mosby a ticket on the night of the murder.[28]

The prosecutor's statement about "sending a signal," on the other hand, was improper. (*See* Appellant's Br. 47-48.) The prosecutor argued that:

> This is your decision. The decision you make will send a signal definitely directly back. Is it too much to ask to protect a witness, to do everything we can to insure the safety of a witness so that they can come in court, come up here and testify so that they wouldn't be scared to death and avoid coming into any trial and any courtroom to any murder case or this one in particular so that they can tell the Ladies and Gentlemen of this jury or the next jury or the one across the hall in Judge Hodge's courtroom what they saw?

(Trial Tr. vol. 9, 27:14-25.) To a certain degree, when the comment is viewed in context, it appears to be an attempt to address the credibility of the Government witnesses that participated in the Witness Protection Program. (*See id.* at 27:4-28:23.) The prosecutor stated that "the defense wants to

---

[28]  The prosecutor stated:

> Then what happened? A day or so later, two days later, guess what happened the night of the murder? Steven Hodge wrote John Williams a ticket at ten o'clock. The craziest fluke, twist, irony of all time. You write a ticket to man that kills you 2 hours later. And maybe from his death he is writing back, hey, this is the man. He gave the big hint.

(Trial Tr. vol. 9, 59:7-14.)

make it seem – you heard the questions and you heard the comments in the open[ing] statement [–] that we paid off the witnesses." (*Id.* at 28:11-13.)  However, the comment goes beyond discussing the credibility of the witnesses and instead entreats the jury to "send a signal," a broader societal message, and as such was improper.  *See Young*, 470 U.S. at 18 (finding that the prosecutor committed error by "exhort[ing] the jury to 'do its job'" thereby exerting pressure on the jury); *see also Moore*, 255 F.3d at 117 (noting that a prosecutor commits error by requesting that the jury "decide guilt on something other than the evidence" or by appealing to the jury to "decide cases based on passion and emotion").  This comment put pressure on the jury to return a verdict that would help sustain the Witness Protection Program, a program that the Government had showcased as an important crime-fighting tool.  Although this comment is error, it did not result in a manifest miscarriage of justice in Mosby's case.  In light of the entire record, this comment did not affect the outcome of Mosby's trial as there was compelling evidence of his guilt.  (*See infra* Part III.F.6.)

**5. Alleged Violation of Mosby's Right to Remain Silent and Improper Shifting of the Burden of Proof**

Mosby contends that three of the prosecutor's statements
"violated [his] right to remain silent and improperly shifted
the burden of proof to the defendant." (Appellant's Br. 48.)
Mosby claims that the following comment infringed upon his
right to remain silent: "No, no, no. No, no, no. Angela
Garvin has about as much credibility as Gent Mosby. None.
Zero. Zilch. Nothing." (Trial Tr. vol. 9, 212:18-20.) "A
remark is directed to a defendant's silence when 'the language
used was manifestly intended or was of such character that the
jury would naturally and necessarily take it to be a comment on
the failure of the accused to testify.'" *Brennan*, 326 F.3d at
187 (internal citations omitted). We review Mosby's objection
to the prosecutor's statement for abuse of discretion. The
comment is ambiguous at best; and does not necessarily
implicate Mosby's right to remain silent. In context, it
appears to be a comment on the evidence related to Mosby and
Garvin's aliases and allegedly "sham" store. (*See* Trial Tr.
vol. 9, 211:3-12:21.) We find that the trial court did not
abuse its discretion as the comment was not manifestly intended
or was of such a character that the jury would naturally or
necessarily take it to be a comment on Mosby's failure to
testify. While we would caution prosecutors about comments

such as this, it was not an abuse of discretion for the trial

court to find that it did not constitute misconduct.[29]

Mosby argues that the following two comments improperly

shifted the burden of proof to him:

> Did you hear anything about the police shooting Steven
> Hodge [from the defense]?  No.

> They [the defense] come up with this stuff and have
> everyone believe that it's the police who killed Steven
> Hodge.  Where is the evidence of that?  No.  No.  No.

(Trial Tr. vol. 9, 50:13-14, 52:21-24.)  We review Mosby's

objections to the prosecutor's statements expressed for the

first time on appeal for plain error.  "[T]here is nothing

improper about a prosecutor 'attempt[ing] to focus the jury's

attention on holes in the defense's theory.'"  *Lore*, 430 F.3d

at 213 (internal citation omitted).  These comments were

plainly directed at attacking the defendants' theory that the

police murdered Hodge and did not shift the burden of proof.

Thus, there was no error, and certainly not plain error.

Furthermore, Mosby's argument that "the Government suppressed

evidence that the V.I. Police committed the crime" is

disingenuous.  (*See* Appellant's Br. 48.)  While it is accurate

that the trial judge excluded the in-court testimony and the

---

[29] Although we apply the abuse of discretion standard, we also note that
this comment did not amount to plain error.  This comment is not clear or
obvious error and certainly did not result in a manifest miscarriage of
justice.

alleged prior statements of Paniagua, the defense did advance
the theory that the police may have been responsible for
Hodge's murder.  (*See* Trial Tr. vol. 1, 140:6-43:15 (Mosby's
trial counsel suggesting during opening statements that the
police murdered Hodge); *supra* note 13 (summarizing the evidence
that was presented in support of the theory that the police
murdered Hodge); Trial Tr. vol. 9, 110:16-17:25 (Mosby's trial
counsel detailing during closing argument the evidence related
to the theory that the police murdered Hodge).)  Accordingly,
the prosecutor did not improperly shift the burden of proof to
Mosby, but rather attempted to focus the jury's attention on
holes in the defendants' theory.

### 6. Prosecutor's Misconduct in the Context of the Entire Record

Mosby urges the Court to look at the prosecutor's conduct
in the aggregate.  *See Weekes*, 224 F. App'x at 208 (evaluating
all of the prosecutor's comments together).  Although we find
that, even in the aggregate, the prosecutor's actions did not
so infect the trial as to result in a denial of due process, we
do not condone the conduct of the prosecutor in this case.  As
we noted, "prosecutors have a special and solemn duty to
refrain from improper methods of obtaining a conviction."
*Morena*, 547 F.3d at 193.  The prosecutor in this case did not

conduct himself in a manner that is befitting of an officer of the court. However, as the Supreme Court noted in *Darden*, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." 477 U.S. at 181 (internal quotations omitted); *see also United States v. Bates*, 46 F. App'x 104, 107 (3d Cir. 2002) ("A conviction should only be vacated where 'the prosecutor's remarks, taken as a whole, were sufficiently prejudicial to have deprived the defendant of his right to a fair trial.'" (internal citation omitted)). Whether applying the abuse of discretion standard or the plain error standard, we find that Mosby did not suffer such prejudice because, in the context of the evidence presented during trial, the verdict rendered was surely unattributable to the prosecutor's statements.

Upon examination of the entire trial record, **we affirm** Mosby's conviction. There was testimony at trial that on March 26, 1994, Mosby met with at least two of his co-defendants at New York's Latest Fashions and distributed firearms, which were consistent with those used to murder Hodge, to each of them. Sellwood testified that he observed Mosby give guns to Vanterpool and Fleming. Daniel similarly testified that,

around that same time, he too independently observed Mosby and
Fleming in the store and saw Harris and Vanterpool in the
bathroom.  Daniel stated that he heard a clicking sound
emanating from the bathroom, which he believed to be the sound
of a gun.  It is important to note that there is no evidence in
the record to suggest that these witnesses discussed their
testimony with one another.

Sellwood provided additional testimony concerning the
purpose for the guns and linked Mosby to the Hodge murder
scene.  Sellwood stated that he heard Mosby tell Vanterpool and
Fleming that "[he] was going to pick them up later about 11:30.
They have a serious job to do . . . ."  Hodge was murdered
within that exact time frame.  In addition, while Sellwood was
in Mosby's store, he noticed a towel on the back of Mosby's
chair.[30]  The police found a towel with gun powder and gunshot
residue on it at the murder scene and Celestine testified that
she saw a man get out of a truck shortly before Hodge was
murdered and place an object in the grass near Hodge's home.

Additional independent witnesses provided further
testimony linking Mosby to the murder scene.  Sorhaindo and
Pennyfeather recalled seeing men, dressed in black, heading
towards Hodge's home shortly before the murder, and fleeing the

scene immediately after Hodge was killed. Daniel placed Mosby in all black attire only hours after Hodge was shot. Moreover, Sorhaindo identified Mosby from a photo array as one of the men dressed in black. Again, there is no evidence in the record to suggest that these witnesses discussed their testimony with one another.

Finally, there is the evidence provided by Mosby himself: the evidence of Mosby's consciousness of guilt. Sellwood testified that Mosby, along with co-defendants Fleming and Vanterpool, threatened his life if he talked to anyone about what he had witnessed in New York's Latest Fashions on the day of Hodge's murder.

Accordingly, when viewing the record in its entirety, we have no difficulty in concluding that the jury based its verdict on the quality of the proof offered at trial, and that the verdict ultimately rendered was surely unattributable to the theatrics of the prosecutor.[31]

---

[31]Although the trial court did not provide specific curative instructions on any of the alleged improper conduct, we note that the trial court did instruct the jury at the beginning and end of the trial that the attorneys' opening statements and closing arguments were not evidence. (*See* Trial Tr. vol. 1, 53:13-14, 66:15-18; Trial Tr. vol. 9, 221:25-22:2.) The trial court also reminded the jury that it can only consider the guilt or innocence of each defendant based on the evidence admissible against that individual defendant. (*See* Trial Tr. vol. 1, 61:15-62:9; Trial Tr. vol. 9, 242:3-20; *see also* Trial Tr. vol. 5, 47:11-14, 65:15-19.) And finally, the trial court repeatedly informed the jury that the Government has the burden of proof. (*See, e.g.*, Trial Tr. vol. 1, 53:18-24, 54:8-11, 66:1-5; Trial Tr. vol. 9, 235:9-14.)

### G. Change of Venue

Mosby argues that the trial court erred in denying his motion for a change of venue.[32]  He contends that a change in venue was necessary due to the popularity of Officer Hodge, the "intense coverage" of his funeral, and the extensive media coverage surrounding the investigation and arrests. (Appellant's Br. 49, 54.)  Mosby focuses on the media's reports that he had a prior criminal record and was imprisoned in New Jersey on an unrelated drug conviction at the time of his arrest as well as the fact that there were high bail conditions in this case.[33]  Mosby also notes that a May 17, 1996 article, published on the front page of the *Virgin Islands Daily News*, erroneously reported that Mosby's fingerprints were found on the shell casings discovered at the murder scene.  (*Id.* at 49-56.)  Mosby insists that this article was especially damaging because it "supported the Government's theory that [] Mosby was the leader and provided the weapons."  (*Id.* at 50-51.) Finally, Mosby claims that the media coverage was particularly prejudicial given the size of the St. Thomas community, the

---

[32]  Mosby filed a motion for a change of venue on April 8, 1996; he filed supplemental submissions on April 22 and 29, 1996, as well as May 29, 1996. (Appellant's Br. 3.)

[33]  The coverage of the "extraordinarily high bail conditions" did not relate to Mosby, who was already in prison at the time of his arrest, but rather to his co-defendants.  (*See* Appellant's App. II, 82-83, 86.)

proximity to the trial, and the media's emphasis on the fact
that Mosby was "a stranger to St. Thomas." (*Id.* at 50, 53-55.)

We review the trial court's denial of Mosby's motion for a
change of venue for abuse of discretion. *See United States v.
Inigo*, 925 F.2d 641, 654 (3d Cir. 1991). "[T]he right to jury
trial guarantees to the criminally accused a fair trial by a
panel of impartial, 'indifferent' jurors." *Hetzel v. Lamas*,
No. 09-3043, 2010 WL 1063896, at *2 (3d Cir. Mar. 24, 2010)
(quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). When a
motion to change venue has been asserted, the burden rests with
the defendant to show that he was denied a fair trial because
the jury or specific jurors were somehow prejudiced by pre-
trial publicity. *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966);
*People of V.I. v. Austrie*, No. 08-370, 2009 WL 1674418, at *4
(V.I. Super. June 4, 2009). "Pre-trial publicity exposure will
not automatically taint a juror. Even if the juror has heard of
or about the case and of the allegations of a defendant's
guilt, he may sit if he is still capable of abandoning his
prior impressions and rendering a fair verdict on the
evidence." *United States v. Provenzano*, 620 F.2d 985, 990 (3d
Cir. 1980). However, in the "exceedingly rare" case, a
defendant may be able to demonstrate that pretrial publicity
was so adverse as to raise a presumption of prejudice. *See*

*id.; Flamer v. State of Delaware*, 68 F.3d 736, 754 (3d Cir. 1995).  However, "we will presume prejudice only in the rare case where the 'media or other community reaction to a crime or a defendant engenders an atmosphere so hostile and pervasive as to preclude a rational trial process.'"  *Hetzel*, 2010 WL 1063896, at *2 (internal citations omitted).  In other cases, a defendant may be able to demonstrate prejudice amongst the venire where the defendant can show that jurors determined that the defendant was guilty based on media coverage and that they were unable to put aside that opinion and render a verdict based on the evidence at trial.  *See Murphy v. Florida*, 421 U.S. 794, 798 (1975); *DeLeon v. Wynder*, No. 06-175, 2007 WL 2254523, at *6 (W.D. Pa. Aug. 6, 2007).

In demonstrating prejudice, it is not enough for the defendant to show that the jurors heard about the case.  *See Hetzel*, 2010 WL 1063896, at *2 ("[J]urors need not, however, be totally ignorant of the facts and issues involved." (quoting *Murphy*, 421 U.S. at 799-800)); *Gov't of V.I. v. Riley*, 973 F.2d 224, 227 (3d Cir. 1992) ("The Supreme Court has made it clear that the 'relevant question is not whether the community remembered the case, but whether the jurors at [the] trial had such fixed opinions that they could not judge impartially the guilt of the defendant.'" (quoting *Patton v. Yount*, 467 U.S.

1025, 1035 (1984))).  "Even if the juror has heard of or about

the case and of the allegations of a defendant's guilt, he may

sit if he is still capable of abandoning his prior impressions

and rendering a fair verdict on the evidence."  *Riley*, 973 F.2d

at 227.  In making this determination, courts consider the

content, quantity, timing, and distribution of the media

coverage as well as the attitudes expressed during the actual

voir dire.  *See Hetzel*, 2010 WL 1063896, at *2; *Inigo*, 925 F.2d

at 655.  The defendant bears the burden of proof on a motion

for a change of venue.  *People of V.I. v. Austrie*, No. 08-370,

2009 WL 1674418, at *4 (V.I. Super. June 4, 2009).

We find that the trial court did not abuse its discretion

by denying Mosby's motion for a change of venue.  First, the

articles included in Mosby's Appendix are primarily factual and

objective reports of the crime, investigation, and arrest. *See*

*Inigo*, 925 F.2d at 655 ("[T]he articles were primarily factual,

a factor that undercuts a finding of prejudice.").  In fact,

much of the information in the articles, including the details

of how Hodge was killed and the fact that some witnesses were

in the Witness Protection Program, was presented at trial.

Although the May 17, 1996 article erroneously reported that

Mosby's fingerprints were found on the shell casings, this

article was published three months before trial and a

correction was printed the very next day.  (*See* Appellant's

App. II, 23.)[34]  In addition, we note that other courts

considering media coverage with far more extensive and damaging

reporting have not found that such coverage required a change

of venue.  *See, e.g., Mu'Min v. Virginia*, 500 U.S. 415, 418,

431-32 (1991) (finding that a defendant received a fair trial

even though forty-seven newspaper articles published prior to

trial reported the details of the crime and investigation, the

defendant's prior criminal record, parole rejections, and

prison infractions, as well as the details of a prior murder

committed by the defendant and the unavailability of the death

penalty for that murder).  Second, many of the reports were

published prior to 1996, the year of Mosby's trial.  (*See id.*

at 66-75, 77-79, 82.)  Third, Mosby includes less than twenty-

five articles from the more than two year period leading up to

the trial.  Finally, In sum, Mosby fails to show that any

individual juror or the empanelled jury as a whole was

prejudiced by the pretrial publicity in such a way that voir

dire was incapable of assuring an impartial jury.[35]  In fact,

the record reveals that the trial court remained vigilant in

---

[35]  The voir dire of the potential jurors in this case is not a part of the record on appeal. (*See* Gov't's Br. 76, 78 n.23.)

excluding jurors who revealed any bias. (*See* Trial Tr. vol. 1, 8:17-16:17, 21:11-28:4.)

"A juror's ignorance may not be expected; only a juror's impartiality can be assured." *Martin v. Warden of Huntingdon State Corr. Inst.*, 653 F.2d 799, 806 (3d Cir. 1981). Although almost every juror admitted some knowledge of the crime prior to the start of trial, (*see* Trial Tr. vol. 1, 27:18-20, 70:16-22), Mosby has failed to demonstrate that either a presumption of prejudice should attach in this case or that there was in fact actual prejudice. *See Mu'Min v. Virginia*, 500 U.S. 415, 417 (1991) (affirming a conviction in which "8 of the 12 venire persons eventually sworn as jurors answered on voir dire that they had read or heard something about the case"); *Hetzel*, 2010 WL 1063896, at *5 (selecting a jury from a venire in which slightly more than two-thirds of the seventy-five people had heard or read about the case); *Riley*, 973 F.2d at 226 (selecting a jury from a venire in which fifty-two of the sixty-eight people had heard or read about the first trial, which resulted in a mistrial). Accordingly, the trial court did not abuse its discretion in denying Mosby's motion for a change of venue.

**IV.   CONCLUSION**

For the foregoing reasons, we affirm Appellant Gent Mosby's seven-count conviction and sentence.  An order consistent with this Opinion shall follow.